UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO.  3:98CR102 (AHN) |
| V. | : | |
| | : | |
| RICHARD LESPIER | : | |

## RECOMMENDED RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL

## I.   Introduction

On June 3, 1998, Richard Lespier and a co-defendant, Luis Adorno, were indicted by a federal grand jury for the December 9, 1996 murder of Carlito Brown, alleged to be in violation of 18 U.S.C. § 1959(a)(1), the violent crimes in aid of racketeering ("VCAR") statute.  Adorno was originally charged with murder in the state court system, but the state charge was dismissed when the federal indictment was returned.  Just prior to trial, Adorno entered into a cooperation agreement with the Government and pleaded guilty to shooting Carlito Brown.  Lespier proceeded to trial, which trial was conducted from July 20-23, 1999.

On July 23, 1999, the jury returned a guilty verdict against Lespier.  On December 6, 1999, Lespier was sentenced to the mandatory minimum under the VCAR statute, life imprisonment.  Lespier appealed his conviction, and the judgment of conviction was affirmed on March 12, 2001.  United States v. Adorno, No. 99-1784, 2001 WL 253119 (2d Cir. March 12, 2001).

On July 22, 2002, Lespier sought a new trial pursuant to Fed. R. Crim. P. 33. [Doc. #120]. The Government objected to the motion for new trial on August 19, 2002. [Doc. #121]. On July 20-21, 2004, the Court conducted a hearing on Lespier's motion for new trial. Testimony was taken from both Adorno and Special Agent David Dillon of the Federal Bureau of Investigation. During the hearing, the Court granted Lespier's request to submit a post-hearing memorandum of law. On November 9, 2004, Lespier submitted his post-hearing memorandum. On August 24, 2005, the United States filed its opposition.

For the reasons stated below, the defendant's motion for a new trial [Doc. #120] is **DENIED**.

## II.   Factual Background

### A.   The Trial Evidence

This case arises from the deadly turf war between two gangs, the Latin Kings and Los Solidos. Lespier was the president of the Meriden, Connecticut, chapter of the Latin Kings ("Meriden" chapter). (7/21/99:237).[1] Adorno was a soldier in the Latin Kings. (Id. at 232, 236). The government's evidence at trial came primarily in the form of testimony from seven (7) witnesses: Luis Adorno; Jose Reyes; Erica Lopez; George Diaz; Randall Pollock; Thomas Kerr; and Annette Boultron.

---

[1]  This reference describes the date of the testimony followed by the page number. The Court will follow this citation format throughout this Recommended Ruling.

Adorno testified that on December 7, 1996, he attended a meeting of the Latin Kings. (Id. at 253-54).  At the end of the meeting, Lespier, Adorno, Adorno's brother "Little Ricky", Jose Malve, Ray Dog, and Tito privately met in a back room. (Id. at 255).  Lespier ordered Adorno, "Little Ricky", and Jose Malve to kill Alex Moreno, a Los Solidos member. (Id. at 255-57).  Lespier drove them around that night to find Moreno, but their attempts were unsuccessful. (Id. at 258).  Lespier told Adorno that he would beep him when they were ready to look again. (Id. at 258-59).  On December 9, 1996, Adorno was contacted by Lespier, by beeper, to resume looking for Moreno. (Id. at 260).  Lespier, Adorno, "Little Ricky", and Ray Dog located Moreno in a car driven by Carlito Brown. (Id. at 262-64; 269).  Lespier warned Adorno to "make sure [he got] Alex." (Id. at 270).  Adorno opened fire on the car intending to gun down Moreno. (Id.)  Adorno saw Moreno duck. (Id. at 271).  Adorno missed Moreno, but hit Brown in the head, killing him. (7/22/99:88).

Jose Reyes testified that, in December of 1996, he became the Director of Security for the Latin Kings. (7/20/99:122-23).  This meant that he was responsible for the security of all Latin Kings in the State of Connecticut. (Id.)  After describing the structure of the Latin Kings, Reyes stated that he went to Meriden, Connecticut on a few occasions.  During the first excursion, Reyes went with Raul Medina and George Diaz to investigate a rumor that Los Solidos gang members were in New Haven, Connecticut. (Id. at 145-46).  On the second trip, Reyes

3

went with the entire Executive Board to investigate a rumor that a Latin Kings member had killed someone.  (Id. at 151-52).  Reyes went to Lespier's home, where a Latin Kings meeting was held. (Id. at 153).  Reyes asked questions regarding Los Solidos and questioned why the former Latin Kings president had stepped down. (Id. at 153-58).  One Latin Kings member started explaining the shooting/murder[2], and Lespier then jumped up and said they had "nothing to get mad about because the mission was done and the brother got away with it."  (Id. at 160).  Lespier told Reyes that when he approached the former president about the problems with the Los Solidos, the president did nothing.  (Id.)  As a result, Lespier overtook the president's position and ordered the "hit".  (Id. at 161).  Approximately one week later, Lespier told Reyes that there was a leak in the "family", and that the "brother" who had committed the murder had been arrested.  (Id. at 165).

On cross-examination, Reyes was questioned at length regarding his motives for cooperating with, and testifying for, the government.  (Id. at 174).  Reyes testified that he was cooperating in the hopes of gaining some benefit for himself, that is, a reduced sentence on unrelated charges.  (Id. at 174-79).  When asked if he was trying to impress the government so it would make a downward departure motion, Reyes stated that he would tell the truth, whether it satisfied the government or not.

---

[2]  The shooting was also referred to by many witnesses as a "mission".  (Id. at 153-58).

4

(Id. at 181).  This line of questioning went on for quite some time.  (Id. at 182-84).  Lespier's counsel also delved extensively into Reyes' criminal history and unsavory character. (Id. at 193-203).

The government also presented Erica Lopez, Adorno's girlfriend, as a witness.  (Id. at 271).  Lopez testified that on December 9, 1996, Adorno met her in front of her house after school.  (Id. at 279).  After walking to the store together to buy "munchies", Adorno and Lopez went to her apartment.  (Id. at 280).  Adorno then said he was going back to the store because he forgot to buy cigarettes.  (Id.)  Later that night, at approximately 7:00 p.m., Adorno's beeper went off.  (Id. at 281). After receiving the beep, Adorno left without telling her where he was going.  (Id. at 282).  Adorno came back around 8:30 p.m. and would not explain where he had been.  (Id. at 283).

George Diaz testified he joined the Latin Kings in 1992 and became the Chief Enforcer in 1994. (7/21/99:47).  In 1997, Diaz pled guilty to conspiracy to distribute drugs and was sentenced to five years imprisonment.  (7/21/99:44, 46).  Diaz signed a cooperation agreement with the government and testified in another Latin Kings murder trial.  (Id. at 46).  In February of 1996, Diaz attended a Latin Kings meeting in Meriden and met Lespier, who was, at that time, the vice-president of the Meriden chapter.  (Id. at 58).  On a subsequent visit to Meriden, Hunsbado, who was then serving as the president of the Meriden chapter, told Diaz to leave because the Latin Kings were at war

with Los Solidos.  (<u>Id.</u> at 71).  As a result of that
conversation, Diaz returned to New Haven, and told Reyes, the
Chief Security Officer, of the problems in Meriden.  (<u>Id.</u> at 72).
The next day Diaz traveled back to Meriden with Reyes and Medina.
(<u>Id.</u> at 73).  On the return trip, Reyes told Diaz that there was
"a killing" in Meriden.  (<u>Id.</u> at 86).

    Randall Pollock also testified on behalf on the government.
Pollock stated that on the night of December 9, 1996, he received
a telephone call from Carlito Brown.  (<u>Id.</u> at 121).  As a result
of that call, Pollock requested someone, who had just purchased
drugs from him, for a ride to "Alex's[3]" house.  (<u>Id.</u> at 122).
Pollock was dropped off on Hickory Street, which was around the
corner from Alex's house.  (<u>Id.</u> at 123-24).  While walking down
Hickory Street, Pollock said he saw Alex's car go by, and he
tried to flag him down.  (<u>Id.</u> at 125).  At the same time, Pollock
heard a car skidding and saw a white car block Alex's car.  (<u>Id.</u>
at 127).  Pollock saw the back door of the white car open and
said that "Bebe[4]" began to shoot at Alex's car.  (<u>Id.</u>).  Pollock
then ducked behind a car until he heard the car speed off.  (<u>Id.</u>
at 128).  Pollock saw Alex's car roll into the church parking
lot.  (<u>Id.</u>).  Pollock also saw Alex Moreno jump out of the car
and run away.  (<u>Id.</u>).  Pollock ran up to car, opened the

---

    [3] Although not clearly identified at this point in the
transcript, the testimony reflects that Pollock was referring to
Alex Moreno when talking about "Alex".

    [4] Luis Adorno's nickname is BeBe.

passenger door, looked inside, and saw Carlito Brown bleeding from the head.  (Id. at 129-30).  Pollock then ran away.  (Id.)

On cross-examination, in addition to extensively questioning Pollock's credibility as to his factual testimony, Lespier's counsel delved into Pollock's motives for testifying.  (Id. at 164).  Lespier's counsel drew attention to the fact that Pollock did not come forward voluntarily and only told the police what he knew after he was arrested on outstanding warrants.  (Id. at 165).  From the exchange, it is clear that Lespier's counsel outlined for the jury the defense's interpretation of Pollock's testimony; that is, Pollock would testify to anything in order to receive a reduced sentence.  (Id. at 166-70).

Thomas Kerr testified that in 1992 he became involved with a street gang named "the Netas".  (7/22/99:91).  In 1996, Kerr was arrested and detained at Whalley Correctional Center on a stolen motor vehicle charge, and at that time, met an individual nicknamed "BeBe".  (Id. at 94).  Subsequently, in March of 1998, Kerr was in the Corrigan facility and met Lespier.  (Id. 96-98).  Lespier discussed the Latin Kings with Kerr and voiced his concerns about "BeBe" cooperating with officials.  (Id. at 100-01; 104-05).  Lespier told Kerr that "them devils want to fry me for sending somebody to do something."  (Id. at 106).  Lespier also asked Kerr how "they could request the death penalty when he did not even pull the trigger."  (Id. at 107).  Subsequently, Lespier assured Kerr that the police had no evidence on him,

except for "hair" (sic - hearsay) and "if BeBe talks."  (Id. at
108).

On cross-examination, Lespier's counsel spent an extensive
amount of time covering the charges pending against Kerr and his
motives for cooperating.  (Id. at 128-40).  It was evident
counsel was questioning Kerr's credibility and reliability, and
insinuating that the only reason Kerr was testifying was to
benefit himself.  (Id.).

Annette Boultron testified that in 1993, while incarcerated,
she became a member of the Latin Kings.  (Id. at 154).  When
released, Boultron began having a relationship with Lespier, and
in May of 1996, began living with him.  (Id. at 155-56).
Boultron testified that, on December 9, 1996, she drove a rented
white Ford Escort to work.  (Id. at 165-66).  Later that night,
Lespier was driving the Escort to drop off Boultron's sister.
(Id. at 168).  According to Boultron, Lespier became upset when
they saw a black car which he believed had a Latin King member
riding with a Los Solidos member.  (Id. at 170).  Upon arriving
at the Mills housing project, Lespier asked Boultron to stay with
her sister.  (Id. at 174).  Upon exiting the car, Boultron saw
Lespier approach Ray Dog, Tito, Manor, Little Ricky, and BeBe.
(Id. at 174-75).  Twenty-five minutes later, Lespier returned in
his work truck to pick her up.  (Id. at 176-77).  On the way
home, Boultron noticed police and rescue workers on Lewis Avenue,
and saw the bullet-ridden black car.  (Id. at 178-79).  Boultron
drove the white car to work the next day and noticed a bag of

8

clothes.  (Id. at 184).  Boultron took the clothes home.  (Id.)
Lespier was upset that she brought the clothes home, and he
identified the clothes as Ray Dog's.  (Id.)  Lespier and Boultron
then burned the clothes.  (Id.)

B.    **The Recantation**

Approximately two years after testifying for the government,
Adorno asked his father to contact Lespier's counsel.
(7/20/04:19).  While the parties disagree over Adorno's motives
for initiating this contact, it is clear that Adorno did meet
with Lespier's counsel on three separate occasions and signed an
affidavit recanting his trial testimony.[5]  (Id. at 20, 24, 30-
32).  Based on this affidavit, Lespier moved for a new trial
pursuant to Rule 33 of the Federal Rules of Criminal Procedure.
The government opposed this motion.

C.    **The Retraction of the Recantation**

The trial judge conducted an extensive evidentiary hearing
on the motion for new trial on July 20 and 21, 2004.[6]  In support
of his motion, Lespier presented two witnesses, Adorno and
Special Agent David Dillon.

At the hearing, Adorno repeatedly repudiated the affidavit
which recanted his trial testimony.  On both direct- and cross-
examination, Adorno offered several reasons for lying and signing

---

[5]  Specifically, Adorno's affidavit stated that he did not
kill Brown, and Lespier did not order him to do so.

[6] This motion was subsequently referred to the Magistrate
Judge for a recommended ruling. [Doc. # 150].

the false affidavit.  First, Adorno testified that he contacted Lespier's attorney to recant his trial testimony in an effort to get the attention of his attorney or the government attorneys. (7/21/04:28-29).  Adorno stated that if he had his attorney's telephone number, he never would have submitted the false affidavit.  (Id.).

Second, Adorno said he was receiving threats of physical harm by other Latin Kings who were serving prison sentences. (Id. at 25).  Adorno testified that, in order to avoid physical harm, he requested that he be placed in the Special Housing Unit ("SHU").  (Id. at 24-25).  However, the living conditions in the SHU were so "horrible", Adorno felt he could not serve the remainder of his sentence under those conditions.  (Id.  at 26). Adorno said he lied because he "just wanted protection."  (Id. at 8).  Adorno also testified that he believed recanting his trial testimony would convince other Latin King prisoners that he was no longer a "snitch", and would allow him to be placed in the general population, without fear of retaliation.  (Id. at 28).

Third, Adorno testified that Lespier's attorney never suggested he obtain an attorney and never advised him what perjury was or the ramifications of perjury.  (Id. at 30-31). Adorno said that he could not tell Lespier's attorney the real reason for contacting him because the attorney told Adorno he could do nothing for him and was not there to help him. (7/20/04:41 and 7/21/04:37).

10

## III. **Discussion**

### A. **Standard of Review**

Rule 33 of the Federal Rules of Criminal Procedure provides that, upon motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Id. One basis for granting a motion for a new trial is newly discovered evidence. Fed. R. Crim. P. 33(b)(1). "Motions for a new trial based upon newly discovered evidence are 'granted only with great caution.'" United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987) (citing United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975); United States v. Troche, 243 F.2d 401, 403 (2d Cir. 1954) (findings on motions for new trial will only be overruled in "extraordinary circumstances); United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993) (new trial warranted "only in the most extraordinary of circumstances").

A witness's affidavit recanting his trial testimony can qualify as newly discovered evidence and, in appropriate circumstances, may warrant a new trial. United States v. Leibowitz, 919 F.2d 482, 483 (7th Cir. 1990), cert denied, 499 U.S. 953 (1991). However, these circumstances are rare. While courts view new trial motions with great caution, when the newly discovered evidence is a recantation of trial testimony, this stringent standard turns into skepticism. DiPaolo, 835 F.2d at 49 (motions for a new trial based on witness recantations are "looked upon with the utmost suspicion") (citing United States ex rel. Sostre v. Festa, 513 F.2d 1313, 1318 (2d Cir.), cert.

11

denied, 423 U.S. 841 (1975) (citations omitted); United States v.
Bednard, 776 F.2d 236, 238-39 (8th Cir. 1985) (new trial motions
based on recanted testimony are immediately suspect because
"where a witness makes subsequent statements directly
contradicting earlier testimony, the witness is either lying now,
was lying then, or lied both times").  In cases where a witness
testifies at trial, then recants his trial testimony, and
ultimately, "recants his recantation", the "recanted recantation
can only be viewed with extreme skepticism." United States v.
Gallego, 191 f.3d 156, 165 (2d Cir. 1999).

Accordingly, when a motion for a new trial is based on newly
discovered evidence of recantation, the defendant must prove that
1) the testimony given by a material witness was false; 2) that
without the false testimony the jury might have reached a
different conclusion; and 3) that the party seeking the new trial
was taken by surprise when the false testimony was given and
could not address that falsity until after trial.[7] DiPaolo, 835
F.2d at 49 (citing Sostre, 513 F.2d 1317; United States v.
Alessi, 638 F.2d 466m 479 (2d Cir. 1980); Stofsky, 527 F.2d at
246).  See also, United States v. White, 972 F.2d 16, 20-21 (2d
Cir.), cert. denied, 506 U.S. 1026 (1992) (adding a fourth

---

[7]  The parties concede that this third element is not at
issue in this case.  Although questioning the credibility of
Adorno's trial testimony during cross-examination, Lespier's
counsel could not adequately challenge the truthfulness and
address the falsity of this testimony until Adorno contacted
Lespier's attorney in 2004, two years after the trial, and
recanted his testimony.

element that the evidence is not cumulative of other evidence
introduced at trial).  The defendant has the burden of satisfying
the elements of this three-prong test.  DiPaolo, 835 F.2d at 49
(citing United States v. Brown, 582 F.2d 197, 202 (2d Cir.),
cert. denied, 439 U.S. 915 (1978); United States v. Cruz, 602
F.Supp. 825, 829 (S.D.N.Y. 1985); United States v. Ochs, 548
F.Supp. 502, 512 (S.D.N.Y. 1982).

**B.**   **The Defendant has Failed to Prove that Adorno's Trial Testimony was False**

In considering a motion for new trial based on a recanting
witness's affidavit, the court must first determine if the
defendant has proved that the recanted testimony was false.
White, 972 F.2d at 20 (the "threshold inquiry is whether the
evidence demonstrates that the witness in fact committed
perjury.").  If this first prong is not satisfied, the motion for
new trial must be denied.  United States v. Kearney, 682 F.2d
214, 221 (D.C. Cir. 1982).

In an effort to prove that Adorno perjured himself at trial,
Lespier relies solely on Adorno's affidavit, in which he recanted
his trial testimony.  However, at the hearing conducted on July
20-21, 2004, Adorno repudiated this affidavit and reaffirmed his
trial testimony.  Specifically, Adorno repeatedly testified that
the affidavit was a lie.  (Tr. 7/20/04:10, 18, 24, 25, 26, 29).[8]

---

[8] These are just a few examples of the numerous times on
July 20 and 21, 2004, that Adorno testified his affidavit was a
lie and untruthful.

13

Citing Ortega v. Duncan, 333 F.3d 102 (2d Cir. 2003), Lespier claims that, despite Adorno's repudiation of the recantation, the court "must determine the truthfulness of the witness's trial testimony, and that evaluation is broader and more comprehensive than a simple assessment of the credibility of the recantation."  Def.'s Post-Hearing Memo. at 2.  In Ortega, Garner, a witness, implicated the defendant through his trial testimony.  Two other witnesses also testified, one implicating the defendant and one exonerating the defendant.  Garner then recanted his trial testimony.  Garner stood by his recantation at the hearing on the motion for new trial.  The district court found the recantation "unworthy of belief", and therefore found the trial testimony truthful.  Id. at 106.  The Second Circuit found that the trial court erred "when it focus[ed] exclusively on the credibility of the [witness'] recantation and, in so doing, [did] not ... give proper weight to the other evidence of [the witness'] perjury ...."  Id. at 108.  The "other evidence of perjury" that the Second Circuit held the trial court should have considered was presented at the hearing on the motion for a new trial.[9]

This Court agrees that it cannot focus solely on the credibility of the recantation and must give proper weight to

---

[9]  In Ortega, the "other" evidence of perjury presented at the hearing for a new trial included: 1) testimony from Garner's mother; 2) an affidavit from the witness who provided the second positive identification recanting his trial testimony; and 3) Garner's recantations in other cases.

14

other evidence.  However, the circumstances in this case can be distinguished from <u>Ortega</u>.

First, in <u>Ortega</u>, the witness, Garner, stood by his recantation at the hearing on the motion for new trial.  Here, Adorno specifically repudiated his recantation numerous times at the hearing on the motion for new trial and, more importantly, reaffirmed his trial testimony.  Second, unlike the defendant in <u>Ortega</u>, Lespier did not offer any additional evidence of Adorno's alleged perjury at the hearing on the motion for a new trial.  Lespier relied solely on Adorno's repudiated affidavit, Adorno's motives for repudiating the affidavit, and Special Agent Dillon's testimony.  This evidence, considered as a whole, does not prove Adorno's trial testimony was false.

In light of Adorno's repudiation of his affidavit, the Court finds that the defendant has not offered any evidence that Adorno's trial testimony was false.  This fact alone has led some courts to hold that repudiated recantations, without more, are not newly discovered evidence and will not support a motion for new trial.  In <u>Lindsey v. United States</u>, 368 F.2d 633, 636 (9th Cir. 1966), the court held that while "[a]n unrepudiated recantation ... is substantial and material evidence" entitling a party to a new trial, a recantation that has "itself been repudiated, as is the case here, ... merely becomes impeaching and could be used at a new trial only for the purpose of cross examining the witness and not as substantive evidence."  <u>Id.</u> (citing 8 Moore's Federal Practice 2d Ed., 33-18; cf. <u>Troche</u>, 213

15

F.2d at 403).  <u>See also</u>, <u>United States v. Reyes</u>, 49 F.3d 63, 68
(2d Cir. 1995) ("[n]ew evidence that is merely impeaching will
not ordinarily justify a new trial."); <u>United States v. Curry</u>,
358F.2d 904, 919 (2d Cir. 1966) (evidence bearing only on
credibility is "not a sufficient basis for obtaining a new
trial.")  Instead of focusing solely on the affidavit, Lespier
now tries to prove Adorno's trial testimony was false by
attacking his motives for repudiating the affidavit.

       i.   <u>Adorno's Motives for Repudiating his Recantation</u>

     In an effort to prove that Adorno's trial testimony was
false and that his affidavit was truthful, Lespier now attacks
Adorno's motive for retracting his recantation.  Specifically,
Lespier argues that Adorno is "likely to say and do almost
anything to get what [he] want[ed], especially when what he
wanted was to get out of trouble with the law."  Def.'s Post-
Hearing Memo. at 3 (quoting 47 Hastings L.J. at 1382).  Lespier
alleges that, at the hearing, Adorno offered an "unconvincing
rationale" for repudiating his affidavit, in an attempt to avoid
the possibility of facing new prosecution and more prison time
for committing perjury in the affidavit.  <u>Id.</u> at 4-5.

     Adorno's testimony regarding his motives for signing the
affidavit are plausible.  The Latin Kings established a
threatening presence in the jail system, and Adorno's fear of
retaliation by other members of the Latin Kings was credible.
Adorno testified that his life was in danger.  (7/20/04:34, 38,
39).  Immediately on entering one of the facilities, Adorno was

approached by one of the Latin Kings who said, "we know what you did ... you have to check in" or run the risk of getting hurt. (7/21/04:89).  Adorno also testified that he was under pressure from the Latin Kings, and was approached by someone named "Luis", a Latin Kings member, who suggested that he recant his testimony. (7/20/04:36-38 and 7/21/04:8).

As a result of his fear of being housed with other Latin Kings, Adorno said he requested placement in the Special Housing Unit ("SHU").  (7/21/04:24)   Living conditions at the SHU were horrible and were considered a punishment.  (Id. at 24-26).  The government's promise to place Adorno in a witness protection program had "fallen through the cracks."  (Id. at 75). Therefore, in a misguided effort to gain the attention of his own attorney and the government, Adorno contacted Lespier's attorneys in order to recant his trial testimony.  (Id. at 26-28).  Adorno thought that if he recanted his trial testimony, other Latin King members would no longer think he was a "snitch" and he would no longer be hassled.  (Id.)

Adorno testified that he did not know that signing the false affidavit was perjury, and that Lespier's counsel failed to ask Adorno whether he wanted an attorney.  (Id. at 30-31).  Adorno testified that he would not have signed the affidavit if he had been represented by his attorney.  (Id. at 35).  When asked why he did not tell Lespier's attorneys the reasons he was recanting his testimony, Adorno stated that Lespier's attorneys advised him

that they were not there to help him and that they were "not gonna do nothing for [him]." (7/20/04:77).

Based on these facts, the Court finds that Adorno's stated reasons for recanting his trial testimony are as credible as Lespier's arguments that Adorno repudiated the affidavit to avoid future perjury charges. Although Adorno's method of drawing attention to himself was clearly improper, it does not support Lespier's argument that Adorno is "likely to say and do almost anything to get what [he] wants". Def. Post-Trial Memo. at 1.

Additionally, Adorno's testimony at the hearing on the motion was consistent with his trial testimony. Adorno testified that Lespier was the president of the Meriden chapter, and in December of 1996, on Lespier's order, he shot and killed Carlito Brown. (7/21/04:17-18). Adorno stated that if he did not do as ordered, he would have been kicked out of the gang, hurt, or even killed. (7/21/04:18-19). The only inconsistency in Adorno's testimony is his affidavit, which was repudiated.

### ii.   Adorno's Trial Testimony was Corroborated by Several Witnesses

At trial, Adorno testified that on the night of December 9, 1996, on direct orders from Lespier, Adorno shot at a car in which Moreno, a rival gang member was riding. (7/21/99:26-70). Adorno testified that when Moreno ducked, the bullet struck Carlito Brown in the head. (7/22/99:88). This trial testimony was corroborated by several witnesses.

18

Randall Pollack testified regarding his observations on the night of December 9, 1996.  Pollack stated that he observed Adorno step out of a white car and shoot a gun at the occupants of the another car.  (7/21/99:127).  Although he could not identify the occupants, Pollack did see Moreno get out of the car and flee.  Id. at 128.  Pollack approached the car and saw Brown bleeding from the head.  Id. at 129-30.

Boultron, Lespier's former girlfriend, also provided cooroborating testimony.  Boultron verified the following facts of Adorno's testimony: 1) that Lespier had access to a white Ford Escort on the night of December 9, 1996; 2) that Lespier met Adorno and others at the Mills housing project that night; and 3) that Lespier left her at the housing project for approximately one-half hour that night.  (7/22/99:165-70).  Boultron also testified that, on the way to her sister's, Lespier was upset when he observed a black car with both a Latin Kings member and a Los Solidos member as passengers.  (Id. at 177).  Later that night she observed the same black car riddled with bullet holes. (Id. at 177-79).

Erica Lopez, Adorno's ex-girlfriend, corroborated Adorno's testimony that: 1) he was at her house on December 9, 1996; 2) that Adorno's beeper went off around 7:00 p.m. that night; and 3) that Adorno then left her house.  (Id. at 281-82).

As Lespier has not established that Adorno's trial testimony was false, the motion for a new trial must be denied.

**D.** **There is no Evidence that the Jury would have Acquitted Lespier without Adorno's Testimony**

Even if the Court were to find that the defendant had proven Adorno's trial testimony was false, the defendant has failed to satisfy the second element necessary for granting a new trial -- that the jury probably would have acquitted Lespier in the absence of the false testimony.[10]  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (citing United States v. Stofsky, 527 F.2d 237, 245-46 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976).[11]

Adorno was not the sole or essential source of evidence concerning Lespier's order to kill Moreno.  Two other witnesses testified that Lespier admitted to ordering the "hit" on Moreno.

First, Jose Reyes testified that he traveled to Meriden, to investigate a rumor that a Latin Kings member killed a Los Solidos member.[12]  (7/20/99:151-52).  While Reyes was berating

_____

[10] Although not dispositive of this issue, the Court finds it significant that Adorno's testimony was not utilized in the presentation of this case to the grand jury.  Adorno and Lespier were indicted at the same time, meaning Lespier was indicted without Adorno's testimony.  The government only began relying on Adorno's cooperation immediately prior to trial.

[11] A less stringent standard is applied where the defendant proves that the prosecution knowingly used false testimony.  In such instance, a new trial is warranted "where the jury might have acquitted absent the perjury."  Sanchez, 969 F.2d at 1414 (citations omitted).  Lespier has not alleged, and the record does not reflect, that the prosecution knowingly introduced false testimony.  Lespier, therefore, is not entitled to rely on this less stringent standard.

[12] George Diaz, another government witness, corroborated Reyes' testimony.  Diaz testified that he traveled to Meriden

the members, Lespier jumped up and stated that the Board had, "nothing to get mad about because the mission was done and the brother got away with it." (Id. at 160).  Reyes testified that Lespier admitted that he overtook the president's position and ordered the murder. (Id. at 161).

Second, Thomas Kerr, a fellow inmate of Lespier, testified that Lespier boasted of his position with the Latin Kings. (Id. at 96-105).  Upon discovering that Kerr knew Adorno, Lespier talked to him about Adorno and his fear that Adorno was cooperating, on numerous occasions. (Id.)  Kerr testified that one day Lespier was upset and approached him saying, "them devils want to fry me for sending somebody to do something." (Id. at 106).  Lespier also asked, "how could they give me the death penalty.  I didn't pull the trigger." (Id. at 107).  Later that day, Lespier added, "[t]hey don't have nothing on me ...  All they got is hearsay and if Bebe talks." (Id. at 108).

The government presented sufficient evidence against Lespier at trial to sustain the verdict.  The testimony of Boultron, Lopez, Diaz, Pollock, Reyes, and Kerr, as set forth above, established Lespier's motive for ordering the murder of Moreno, his intent in committing the crime, and his presence at the time the crime was committed.  Thus, even without Adorno's trial

---

with Reyes to investigate rumors of trouble with the Los Solidos. (7/21/99:73).  On the return trip, Reyes told Diaz that there was a murder in Meriden.  Id. at 86.

testimony, Lespier cannot demonstrate that the jury would have acquitted him.

In his post-hearing memorandum, Lespier attempts to trivialize the corroborating witnesses' testimony by questioning the motives of these witnesses.  Lespier argues that the testimony of these witnesses must be "viewed skeptically", because of the inducements offered to the witnesses for their cooperation and because of an alleged "lack of corroborating evidence."  Def's Post-Trial Memo. at 10.

It is fundamental that trial courts give deference to the "jury's resolution of the weight of the evidence and the credibility of witnesses."  United States v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983).  A trial court may encroach upon this jury function only in exceptional circumstances.  United States v. Autori, 212 F.3d 105, 120 (2d Cir. 2000).  The question to be answered is "whether letting a guilty verdict stand would be a manifest injustice ...."  United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) ("there must be a real concern that an innocent person may have been convicted") (citing United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001).  In assessing this issue, the court may "weigh the evidence and in doing so evaluate for itself the credibility of witnesses."  Sanchez, 969 F.2d at 1413.  "At the same time, the court may not wholly usurp the jury's role and must give due deference to the jury's resolution of the weight of the evidence and the credibility of witnesses.  United States v. Perez, 2004

WL 3557190, *1 (D.Conn. Aug. 18, 2003) (citing <u>Autori</u>, 212 F.3d at 121.

In concluding that the guilty verdict in this case does not present such a "miscarriage of justice", the Court is persuaded by the admissions of Lespier.  Both Reyes and Kerr testified that Lespier told them about his order to kill Moreno.  Kerr also testified about Lespier's fear that Adorno would cooperate with the government.  Lopez, Diaz, Pollock, Reyes, and Kerr established Lespier's motive for ordering the murder of Moreno, his intent in committing the crime, and his presence at the time the crime was committed.  Although Lespier argues that these witnesses are not credible due to their motivations for testifying and alleged inconsistencies, Lespier's trial counsel had ample opportunity to demonstrate to the jury the witness' alleged bias in favor of the government.  Lespier's counsel vigorously cross-examined these witnesses and thoroughly explored the motives and inconsistencies in each witness' testimony. (7/20/99:174-184; 7/21/99:164-70; 7/22/99:128-40).  Additionally, trial counsel forcefully argued these biases to the jury during closing arguments. (7/23/99:87-122).  The jury had ample opportunity to see the witnesses testify, weigh the evidence, and listen to the arguments of counsel.  There was abundant evidence from which the jury could reasonably have concluded that Lespier not only issued the order to murder Moreno but was present the night Carlito Brown was shot.

As Lespier has failed to establish that the jury's verdict constitutes a "manifest injustice", the motion for new trial must be denied.  _Sanchez_, 969 F.2d at 1414.

**IV.   Conclusion**

For the reasons stated above, Lespier's motion for a new trial pursuant to Fed. R. Crim. P. 33 [Doc. #120] is **DENIED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of its receipt by the parties.  Failure to object within ten (10) days may preclude appellate review.  _See_ 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; _Small v. Secretary of H.H.S._, 892 F.2d 15 (2d Cir. 1989)(per curiam); _F.D.I.C. v. Hillcrest Assoc._, 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED this 28th day of February 2006 at Bridgeport, Connecticut.

_____/s/_____
Holly B. Fitzsimmons
United States Magistrate Judge